## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ALEKS SHESHI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-CV-882-NJR-SCW** |
| | ) | |
| **CASINO QUEEN, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is a motion for summary judgment filed by Defendant Casino Queen, Inc. on June 22, 2016 (Doc. 30). The Court held a hearing on this motion on August 22, 2016 (Doc. 42). For the following reasons and those set forth on the record at the hearing, the motion for summary judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

The Court begins with a general overview of the relevant background facts, which are without genuine dispute. More detailed facts are presented throughout this Order as needed to discuss the specific theories of liability alleged in the complaint.

Plaintiff Aleks Sheshi was born in Albania in the 1960s to an Albanian mother and a Greek father. He lived in Albania until 1990 when he fled with his wife and daughter to Greece during the fall of Communism in Albania. The Sheshi family then immigrated to

the United States in May 1993. Sheshi was hired as a security guard at the Casino Queen in June 1994. He was employed there for twenty one years.

Sheshi claims that he was the only foreign-born security officer at the Casino Queen during the course of his career and that he was treated differently because of it. For example, some of Sheshi's co-workers and supervisors made fun of the way he spoke and ridiculed him for being foreign and Greek. Sheshi was given the least lucrative and least desirable job assignments. He was also picked on and singled out by his supervisors. Things came to a head for Sheshi in October 2014 when a co-worker accused him of stealing tips. There was no definitive proof that Sheshi stole the tip, so he was not fired; but he was given a write-up for failing to follow the Security Department's policy for handling tips. Sheshi believes the investigation conducted by his supervisors into the tip-stealing accusation and the discipline he received was unfair and discriminatory.

A month later, in November 2014, Sheshi missed two days of work when his sister-in-law died. He was terminated by the Casino Queen for a "no call, no show" on the second day. Sheshi attempted to appeal his termination through the Casino's Guaranteed Fair Treatment ("GFT") process, which provides for review by progressively higher levels of management of employee problems, concerns, and complaints (Doc. 39-2, p. 25). The GFT process took an uncharacteristically long time, and over five weeks after he was initially terminated, Sheshi received the GFT decision indicating the termination would stand.

<u>P</u>ROCEDURAL <u>H</u>ISTORY

Sheshi filed a four-count complaint related to his employment and termination in this Court on August 10, 2015 (Doc. 1). Count One is a claim under Title VII for "national origin based discrimination" (Doc. 1). More specifically, Sheshi alleges that the Casino Queen violated Title VII when he was exposed to "discrimination, harassment, and a hostile work environment" because he is of Greek origin (Doc. 1; Doc. 35, p. 1). Based on these allegations, it appears that Sheshi is actually bringing two claims: one for discrimination and one for hostile work environment. The distinction is important because, as discussed below, there are different standards for proving these two types of claims. Consequently, the Court construes Count One as stating both a claim for discrimination and for hostile work environment based on national origin.

The same goes for Count Two, which is a claim under the Age Discrimination in Employment Act ("ADEA") (Doc. 1). Sheshi alleges in the complaint that the Casino Queen violated the ADEA when he was "subjected to unlawful discrimination, harassment and hostile work environment based on his age" (Doc. 1, ¶¶47, 48). Thus, it once again appears that Sheshi is actually bringing two distinct claims: one for discrimination and one for hostile work environment. The Court construes Count Two accordingly.

Count Three is a claim for retaliation, but Sheshi does not specify on which statute the claim is based. It appears that Sheshi is invoking both Title VII and the ADEA because he alleges that he was retaliated against for reporting "unlawful national-origin-based and age-motivated harassment" (Doc. 1, p. 14). Consequently, the

Court construes Count Three as stating both a claim for retaliation under Title VII and a claim for retaliation under the ADEA.

Finally, Count Four is a claim under Illinois common law for wrongful termination.

Following the hearing on the motion for summary judgment on August 22, 2016, the Court granted summary judgment on Count Four for common law wrongful termination. Summary judgment was denied on Sheshi's Title VII claims for discrimination and hostile work environment, and Sheshi's ADEA claim for discrimination. And the motion was taken under advisement as to Sheshi's Title VII claim for retaliation and Sheshi's ADEA claims for hostile work environment and retaliation.

**D**ISCUSSION

I.  ***Standard of Review***

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

II.    *Common Law Claim for Retaliatory Discharge*

In Count Four, Sheshi alleges that the Casino Queen violated Illinois common law by wrongfully terminating him (Doc. 1). In particular, he claims that he was terminated for a "no-call, no-show" after he was granted bereavement leave or time off (Doc. 36, p. 19).

The tort of retaliatory discharge "is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981). To sustain a cause of action for retaliatory discharge, an employee must prove that he was discharged in retaliation for his activities and that the discharge violates a clear mandate of public policy. *Michael v. Precision Alliance Group, LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014) (citing *Turner v. Memorial Medical Center*, 911 N.E.2d 369 (Ill. 2009)). "[T]here is no precise definition of what constitutes clearly mandated public policy," but Illinois courts have identified only two situations in which the standard is met: (1) when an employee is fired for asserting a workers' compensation claim, and (2) when an employee is fired for refusing to engage in or reporting illegal conduct, otherwise known as "whistleblowing." *Michael*, 21 N.E.3d at 1188; *Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 277 F.3d 936, 941 (7th Cir. 2002). *See also Irizarry v. Illinois Cent. R.R. Co.*, 879 N.E.2d 1007, 1012–14 (Ill. App. Ct. 2007) (discussing instances where Illinois courts refused to expand the retaliatory discharge tort to cover a discharge for exercising right to free speech, for filing an FELA claim, for filing a health insurance claim, for filing a libel and slander suit against employer, and for marrying a coworker).

Firing an employee for missing work to attend a family member's funeral is contemptible, without a doubt. But unfortunately for Sheshi, it does not make the Casino Queen liable for the tort of retaliatory discharge. That tort is very narrowly construed, and Sheshi's claim simply does not fit within either of the two recognized categories for sustaining a retaliatory discharge claim. Accordingly, summary judgment is granted to Defendant on Count Four for common law wrongful termination.

### III. *Title VII Claims*

Title VII prohibits employers from discriminating against any individual because of the individual's national origin, which includes subjecting employees to a hostile or abusive work environment. 42 U.S.C. § 2000e–2(a)(1); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014)). Employers are also prohibited from retaliating against employees for complaining about unlawful discrimination. 42 U.S.C. § 2000e–3(a); *Boss*, 816 F.3d at 916.

Here, Sheshi claims that while he was employed by the Casino Queen, he was the only security guard of foreign national origin. Sheshi further claims that he was subjected to a hostile work environment and discriminated against throughout the course of his career and retaliated against because he was foreign (Doc. 1; Docs. 30, 31). Each of Sheshi's three Title VII claims will be discussed in turn below. But first, the Court will address Defendant's argument disputing Sheshi's national origin.

### A. Plaintiff's National Origin

In his complaint, Sheshi asserts that his national origin is Greek (Doc. 1). According to the Casino Queen, this assertion, which is "at the heart of Sheshi's complaint," is "simply not true"—Plaintiff is Albanian, not Greek (Doc. 31, pp. 3, 5, 6).

The Casino Queen argues that Sheshi's "inaccurate account of his national origin" requires the "immediate termination" of the entire complaint (Doc. 31, p. 6).

The Court disagrees. Defendant's argument embodies a view of national origin discrimination that is far too narrow and also ignores the undisputed evidence. A Title VII claim based on national origin is not just about where an individual was born; it can also be based on where the individual's ancestors were born, or the individual's physical, cultural, or linguistic characteristics. *See Saint Francis College v. Al–Khazrji,* 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (the terms "ancestry" and "ethnicity" overlap with "national origin" as a legal matter); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came."); 29 C.F.R. § 1606.1 (explaining that the EEOC "defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.")

Here, Sheshi's undisputed testimony is that his father was Greek and his mother was Albanian (Doc. 39, p. 6). It is therefore clear that Sheshi has Greek as well as Albanian ancestry. Additionally, Sheshi speaks both Greek and Albanian, and he has lived in both countries (*see id.* at pp. 5, 6). For the purposes of this lawsuit, Sheshi chose to identify his national origin as Greek, perhaps because that is how he self-identifies or perhaps because that is how his co-workers saw him. Either way, his choice is not "wrong" or "untrue," as Defendant claims. The point of Sheshi's Title VII national origin

claims is not to determine the precise makeup of his blood or to dissect the label he chose for himself. The point is that he was born abroad, and he retains traces of foreignness in his speech, and perhaps in his appearance, manners, or other social characteristics as well, and he was treated him less favorably because of it.

Consequently, Sheshi's purported misrepresentation about his national origin does not require dismissal of the entire complaint or even entitle Defendant to summary judgment. Given the tenor and recurring nature of the Casino Queen's argument regarding the perceived misrepresentation (*see* Docs. 31, 37),[1] the Court feels inclined to make clear that this argument about Sheshi's national origin is misguided and meritless, and it should not be brought up again without a very compelling reason for doing so.

### B. Hostile Work Environment

To avoid summary judgment on his Title VII claim for hostile work environment, Sheshi must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on his national origin; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920 (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). "There is no

---

[1] Defense counsel also brought up Plaintiff's national origin at the Final Pretrial Conference held on September 6, 2016.

bright-line test for determining when a workplace becomes objectively hostile."
*Valentine v. City of Chicago,* 452 F.3d 670, 681 (7th Cir. 2006). Sufficiently severe conduct
that occurs only a few times violates Title VII, as does a relentless pattern of lesser
harassment that extends over a long period of time. *Cerros v. Steel Tech., Inc.,* 288 F.3d
1040, 1047 (7th Cir. 2002).

Here, Sheshi claims, and the Casino Queen does not dispute, that while he was
employed by the Casino Queen, he was the only security guard of foreign national origin
(Doc. 1, ¶13; Docs. 30, 31; Doc. 39, p. 9). Sheshi further claims that he was "subject to
constant ridicule and harassed because of his accent and lack of language" (Doc. 36, p.
10; Doc. 39). His wife testified there were many instances where co-employees made fun
of Sheshi's broken English (Doc. 36; Doc. 39-5, p. 7). At times their testimony was very
vague; Sheshi and his wife could not recall many specifics about who made
discriminatory statements, what they said, when they said it, or if anyone witnessed it.
Nonetheless, Sheshi testified that at various points in his career, he faced comments
about his foreignness on a weekly—if not daily—basis from certain individuals.

For example, Sheshi testified that his former sergeant, "Roger", would "always"
make comments about his language, such as "Oh, foreigner coming. Oh you speaking
better English today." (Doc. 39, p. 12). Kim Buescher would use discriminatory language
"any time she was talking to [Plaintiff]"; she would say things like "Hey, you Greek
mother----er" (Doc. 39, pp. 41, 42). Another former supervisor, Corporal Jerry Brooks,
would harass Sheshi or call him names practically every time Brooks saw him (Doc. 39,
pp. 18, 21) ("Anytime I was seeing him, he's going to say something smart"). Brooks

would say things like "what's up foreigner? Do you speak English today?"; "Hey, you speaking better, you foreigner"; "You can write, you foreigner?"; "You can read?" (Doc. 39, pp. 20, 21). While some of the statements seem to be offhand comments that were simply teasing, there were others that were physically threatening or intimidating. Specifically, one time when Sheshi questioned his assignment to drive a bus with no air conditioning on a very hot day, Brooks yanked Sheshi by the arm, yelled at him, and called him a "foreign mother----er" (Doc. 36, p. 11; Doc. 39, p. 19).

Sheshi also provided sworn testimony that he was routinely given the least desirable assignments. In particular, during the first two-thirds of Sheshi's career, when the Casino was on a riverboat and security guards kept all of the tips that they individually made, Sheshi claims that he was frequently assigned to the turnstiles or placed on the floor where he did not earn tips or the tips were minimal (Doc. 39, pp. 11, 12). Sheshi repeatedly complained about his assignment to the turnstiles, but nothing ever changed (*Id.* at p. 12). One time his sergeant, "Roger", said, "yes, that's all you foreigners deserve to be [sic]" (Doc. 39, pp. 11, 12). After the Casino moved off the water and into the building, a tip sharing policy was implemented amongst the security officers, but Sheshi maintains that he was still given the least desirable assignment of working the turnstiles (*see* Doc. 39-4, p. 13).

In October 2014, Sheshi was permanently assigned to the turnstiles (Doc. 36; Doc. 39, p. 43). He testified that he was the only security officer on his shift who did not rotate assignments (Doc. 36; Doc. 39, p. 43). Again, there was also the instance where Corporal Brooks assigned Sheshi to drive a bus with no air conditioning on a very hot day (Doc.

39, pp. 18–19). When Sheshi questioned the assignment, Brooks yanked him by the arm, yelled at him, and called him a "foreign mother----er" (Doc. 36, p. 11; Doc. 39, p. 19). Another time, Brooks said to Sheshi, "I'm going to slap the shit out of you, foreigner" (Doc. 39, p. 18). When Sheshi complained about Corporal Brooks's comments or actions, he was told that nothing could be done (*Id.* at pp. 19, 20).

Sheshi also testified, and his wife corroborated, that he was "picked on" and singled out by his supervisors (Doc. 39, pp. 19, 39, 41). Corporal Donnel Jones was "always coming after [Plaintiff]," and wrote him up for things that other security guards were also doing but did not get in trouble for (Doc. 39, p. 15). Jerry Brooks talked very harshly to Sheshi and frequently issued him write-ups, which often got thrown in the trash because they were frivolous (Doc. 39, p. 19; Doc. 39-5, p. 7). Sheshi's wife also testified that he had "so many problems" with the Director of Security, Ed Muzzey (Doc. 39-5, pp. 8, 9). Muzzey accused Sheshi on two occasions, without any proof, of stealing tips and also accused him of sexually harassing a co-worker (*see* Doc. 39, pp. 10, 37, 39, 40). Muzzey also spoke very harshly and rudely to Sheshi (Doc. 39, p. 40; Doc. 39-5, p. 9). Sheshi felt like Muzzey was waiting to fire him for any mistake, no matter how small (Doc. 39-5, p. 9).

According to Sheshi's wife, he would frequently come home very upset by what people said to him and how he was treated at work (Doc. 39-5, pp. 6, 7, 9). But he persisted in working at the Casino Queen, and often chose not to report the harassment he suffered, for economic reasons (*Id.*).

For its part, the Casino Queen glosses over these incidents without discussing any

of the specifics (*see* Doc. 31, pp. 14–17). For example, when talking about the ridicule Sheshi experienced from Corporal Brooks, the Casino Queen simply says, "Plaintiff identified an incident of May 24, 2015, where Sheshi complained about lack of air conditioning in a bus Sheshi was driving, and also claimed that Brooks made derogatory comments" (Doc. 31, p. 15). The Casino Queen also attempts to minimize and justify the harassers' actions and goes to great lengths to point out all of the things Sheshi could not remember or could not describe in order to portray Sheshi's allegations of a hostile work environment as too generalized and non-specific to survive summary judgment (*see* Doc. 31, pp. 15–17). The Casino Queen also peppers its argument with references to purported "inconsistencies" and "misrepresentations" in Sheshi's allegations that are unrelated to his hostile work environment claim (*see* Doc. 31, pp. 14, 15, 16), which the Court interprets as a suggestion that Sheshi's story of harassment should be viewed with skepticism. None of this is sufficient to entitle the Casino Queen to summary judgment. *See D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) ("At the summary judgment level, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe.") (citation and internal quotation marks omitted); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir.1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

Importantly, the Casino Queen never disputed, much less outright disproved, any of the incidents or facts in Sheshi's version of the story (*see* Doc. 31). Viewing these facts in a light most favorable to Sheshi, and drawing all inferences in his favor, the

Court concludes that Sheshi has produced enough evidence to create a material issue of fact on this claim. There is evidence that Sheshi was ridiculed by a number of the Casino's employees throughout the length of his career, often because of his speech or his foreign origin. Some of the statements seem to be offhand comments that were simply teasing, but others were physically intimidating or threatening. There is also evidence that Sheshi was often given the worst job assignments and singled out by his supervisors. Finally, there is evidence that when Sheshi complained about the way he was being treated, the Casino Queen routinely failed to act. This evidence, if believed, is enough for a reasonable jury to find that Sheshi was subjected to a hostile work environment because of his status as a foreign-born American. Accordingly, the Casino Queen is not entitled to summary judgment on Sheshi's Title VII hostile work environment claim.

## C. Discrimination

To avoid summary judgment on his Title VII claim for discrimination, Sheshi must show that a reasonable jury could find the adverse employment actions he suffered was motivated by discriminatory animus. *Ortiz v. Werner Enterprises, Inc.*, No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). This showing can be made by using the "direct" or "indirect" method of proof. *Boss*, 816 F.3d at 916.

Under the direct method, a plaintiff must "marshal sufficient evidence"—direct, circumstantial, or some combination of the two—that points directly to a discriminatory reason for the adverse employment action. *Boss*, 816 F.3d at 916; *Atanus v. Perry*, 520 F.3d

662, 671 (7th Cir. 2008); *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). *See Ortiz*, 2016 WL 4411434, at *4 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence."). Direct evidence is something akin to an "overt" or "explicit" admission by an employer that its decision was based on a proscribed criterion. *Boss*, 816 F.3d at 916; *Harper v. C.R. England, Inc.*, 687 F.3d 297, 307 (7th Cir. 2012); *Atanus*, 520 F.3d at 671. Circumstantial evidence includes (1) suspicious timing, ambiguous statements (oral or written), or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Boss*, 816 F.3d at 916–17 (citation omitted).

The indirect method involves certain subsets of the circumstantial evidence just listed, incorporated into the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973)). *Boss*, 816 F.3d at 917; *Luks*, 467 F.3d at 1052; *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Specifically, a plaintiff must first create a presumption of discrimination by establishing a *prima facie* case of discrimination. *Atanus*, 520 F.3d at 672. The *prima facie* case is established by showing that the plaintiff (1) is a member of a protected class; (2) performed his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly-situated employee outside of his protected class. *Boss*, 816

F.3d at 917. If the plaintiff establishes that *prima facie* case, the burden shifts to the employer to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason is merely pretext and the real explanation for the action is discrimination. *Id.*

The Seventh Circuit has repeatedly "questioned the utility of the distinctions between [the methods of proof], recognizing that both methods converge on the same fundamental question: could a reasonable trier of fact infer retaliation or discrimination, as the case may be?" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). *See also, e.g., Ortiz*, 2016 WL 4411434, at *4 ("Why have two tests if they consider the same information and answer the same question?"); *Harper*, 687 F.3d at 314 ("[T]he line between circumstantial evidence under the direct method and indirect evidence of discrimination or retaliation under the burden-shifting approach has been blurred by the gradual integration of these methodologies.") Nevertheless, the Court believes it is still obligated, at this point, to consider the two methods separately when analyzing whether to grant summary judgment.[2]

Here, Sheshi does not explicitly indicate whether he is proceeding under the direct or indirect method of proof (*see* Doc. 36). Each party's briefs contain language

---

[2] In March 2016, the Seventh Circuit explained,

> Though the framework has received criticism, litigants and courts properly discuss Title VII discrimination and retaliation claims using the language of the "direct" and "indirect" methods of proof. Under either method, the ultimate question at the summary judgment stage is whether a reasonable jury could find prohibited conduct. But we still must consider the two methods separately when reviewing a grant of summary judgment.

*Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

suggestive of both the direct and indirect methods, but neither brief includes a delineated discussion of either method (*see* Docs. 31, 36). There are a couple indications, however, that Sheshi is proceeding under the direct method. First, a good portion of the evidence he cites in support of his discrimination claim—such as the evidence of harassment, ridicule, and unfair treatment—does not fit into the specific categories of circumstantial evidence used by the indirect method to establish discrimination. Second, while Sheshi claims he "was consistently treated differently from other employees of non-foreign origin," he does not actually identify or put forth any evidence of a similarly situated non-foreign employee who was comparable to him in all material respects but was treated more favorably. Because Sheshi did not point to any other security officer to serve as a basis for comparison, he cannot establish a *prima facie* case of discrimination under the indirect method. *Hutt v. AbbVie Prod. LLC*, 757 F.3d 687, 693 (7th Cir. 2014); *Atanus*, 520 F.3d at 673.

So the question for the Court is whether all of Sheshi's evidence, considered as a whole, permits the inference that he would have been treated better and would have kept his job if he had not been foreign-born. *Ortiz*, 2016 WL 4411434, at *3. First, Sheshi put forth evidence that he was subjected to ridicule and harassment because of his accent and his foreign origin, which the Court already discussed. *See supra* pp. 9–10. Additionally, Sheshi's wife previously worked at the Casino Queen in the Human Resources Department, and she testified that she was also treated poorly at times because she was foreign born (Doc. 39-5, p. 5). For example, one co-worker criticized her

English, and others were overly-critical of her work; they would try to find mistakes and then make a big deal about minor errors (*Id.*).

Second, Sheshi put forth evidence that he was routinely given the least desirable assignments, which the Court already discussed. *See supra* pp. 10–11. The Casino Queen zeroes in on Sheshi's assignment to the turnstiles and contends that Sheshi was unqualified for any other assignments because he did not have a valid driver's license and he couldn't do the work of a dispatcher (Doc. 31, p. 17; Doc. 39-4, p. 16). This argument is not sufficient to negate Sheshi's claim of unfair job assignments as a matter of law. The evidence implies that Sheshi was assigned to work the turnstiles for a vast majority of this career, but he obviously was not without a driver's license that whole time at the Casino because he testified about driving a bus without air conditioning (*see* Doc. 39, pp. 18–19). The Casino Queen does not elaborate beyond its one-sentence argument, or offer any evidence, as to when Sheshi was actually without a driver's license (*see* Doc. 31). As for the dispatcher assignment, Sheshi's supervisor Mike Warner testified that Sheshi was never trained or assigned to do dispatcher work based, at least in part, on his English language and communication skills, which were viewed as subpar (Doc. 39-4, p. 16).

Third, Sheshi claims that he was singled out and treated unfairly by his supervisors, the evidence of which was discussed above. *See supra* p. 11. One particular instance that occurred in October 2014 is a focal point of this lawsuit. On that occasion, Sheshi was handling a jackpot at the slot machines and received a $20 tip from the patron (Doc. 39-1, pp. 39–41). The Security Department's policy required Sheshi to

immediately place the tip under the clip of his clip board in full view of surveillance cameras and to deposit the tip into the tip box as soon as possible (Doc. 39-1, p. 40). Kim Buescher reported that she saw Sheshi take the $20 bill from his clip board and roll it up, but she was not able to follow him to see if he dropped it in the tip box (Doc. 39-1, p. 41). Sheshi was called into the office by his supervisor Mike Warner to speak with Mr. Muzzey (Doc. 39, pp. 40–43). Sheshi denied the accusations (*Id.*). And security footage showed Sheshi dropped money in the tip box, but the denomination of the bill could not be determined (Doc. 36-6). Muzzey still forced Sheshi to empty his pockets (*Id.*). The amount of money in Sheshi's pocket is disputed, but it is undisputed that he had at least one $20 bill in his pocket (*see id.*; Doc. 39-4, pp. 9–10). Sheshi was extremely upset about being forced to empty his pockets because he thought Muzzey was insinuating that, because he was an immigrant, he could not possibly have $20 in his pocket unless he stole it (Doc. 36). Both Muzzey and Warner thought the $20 bill in Sheshi's pocket was the stolen tip (*see* Doc. 39-4, pp. 9–12). But because Muzzey could not definitively prove it, he could not fire Sheshi; so instead, he gave Sheshi a write-up for failing to follow the Security Department's policy on tips (Doc. 39-1, pp. 39, 40; Doc. 39-4, pp. 9–12). Sheshi argues that it was impossible for any security guard to comply with this policy in the literal sense because there were blind spots in the coverage area of the cameras (Doc. 39-4, p. 10). There is no evidence that anyone else besides Sheshi was ever disciplined for this policy violation (Doc. 36, p. 15).

Finally, Sheshi claims the Casino's stated reason for firing him—that he no-called, no-showed on Friday, November 14th—is pretextual and not the real reason he was

fired. Pretext "is a deliberate falsehood," "a lie," "a phony reason for some action."

*Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 666 (7th Cir. 2007). The question "is not whether the employer's stated reason was inaccurate or unfair . . . [because] [i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee." *Collins*, 715 F.3d at 1000 (citing *Coleman v. Donahue,* 667 F.3d 835, 852 (7th Cir. 2012)). Instead, "the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman*, 667 F.3d at 852. In order to show pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted reason "that a reasonable person could find [it] unworthy of credence." *Id.*

The following facts are undisputed. Sheshi's wife called the security dispatch office at the Casino Queen on Wednesday, November 12, 2014, in order to get a message to Sheshi that her sister had just passed away (Docs. 39, 39-4, 39-5). Sheshi was called off the floor and into the security office where one of his supervisors, Donnell Jones, told him the news (Docs. 39, 39-4). Sheshi left work immediately (Docs. 39, 39-4). The next day—Thursday, November 13th—Sheshi called off work by contacting the security dispatch office around noon (Doc. 39, 39-5). Sheshi did not call the Casino on Friday, November 14th. When Sheshi returned to work on Monday, November 17th, he was informed that he was terminated for a no-call, no-show on Friday the 14th (Docs. 39, 39-5).

Sheshi claims that the stated reason for his termination is not credible because he should have received funeral leave to cover his absences on Thursday the 13th and Friday the 14th, but he was unfairly and discriminatorily denied that leave (Doc. 36). As a consequence of that decision, Sheshi did not receive his share of the tips earned by the security guards on the days he was absent (*see* Doc. 39-4, p. 9). The parties dispute whether Sheshi was actually eligible for funeral leave (*see* Docs. 31, 36). The Casino Queen claims the funeral leave policy did not cover sisters-in-law and that Mike Warner told Sheshi as much before Sheshi left work on Wednesday, November 12th (Doc. 31, pp. 6—10). Sheshi argues, however, that the policy is subject to more than one interpretation, and he asserts that he did not speak to Mike Warner before he left work on November 12th (Docs. 36, 39). Instead, he was told by Corporal Jones to "go be with his family," which Sheshi interpreted to be a grant of funeral leave (Doc. 36). The Casino Queen also claims Sheshi did not follow the correct procedures for requesting funeral leave (Doc. 31, pp. 6—10), which Sheshi disputes; according to Sheshi he notified the Casino Queen about the days he would be out when he called on Thursday the 13th (Doc. 36).

In the alternative, Sheshi argues that even if he was entitled to funeral leave, he called off for Friday the 14th (Doc. 36). Both Sheshi and his wife testified that when he called in on Thursday, November 13th, he stated that he needed two days off—that day and the next (Docs. 39, 39-5). Sheshi and his wife both testified that it was permissible to call off for two days at once (Doc. 39-5, pp. 13, 14). Sheshi's wife further testified that he was very conscientious of the rules and always followed them (Doc. 39-5, p. 13).[3]

---

[3] Specifically, Mrs. Sheshi testified, "He inform them that I need two days off because is wake and they already know what happened to family. he know the rules. he worked for so many years and he never

Additionally, Sheshi's supervisors were well aware that his sister-in-law had passed away, and Mike Warner testified that he knew Sheshi "was looking for the Thursday and Friday off" (Doc. 36-2, p. 7). In other words, Sheshi's supervisor knew he was not going to be at work on Friday, which Sheshi reiterated when he called on Thursday. Nevertheless, the Casino Queen claims Sheshi needed to call them and tell them again on Friday, because that is what the rules purportedly require.

At this point, however, it is not at all clear to the Court what the rules required. More specifically, it isn't clear how an employee who doesn't qualify for funeral leave is supposed to go about taking off work to attend a funeral. The Employee Handbook mentions paid vacation days and unpaid personal days, but both of those must be scheduled in advance and therefore are presumably inapplicable to Sheshi's situation (Doc. 39-2, pp. 5, 6). Mike Warner's testimony seems to support that presumption; he testified that Sheshi had to "call off . . . there was other people in front of him, so I couldn't let him just have the time off. He would have to call off" (Doc. 39-4, p. 6). But what does it mean to "call off"? There's no mention of a "call off" in the Handbook (*see* Doc. 39-2). There's mention of an Employee Requested Out ("EERO") (Doc. 39-2, p. 26), which is presumably the same thing as a "call off." But the Handbook does not explain what EERO is, what it can be used for, or what procedures should be followed in requesting it (*see* Doc. 39-2). As previously mentioned, Sheshi and his wife both testified that it was permissible to call off for two days at once, which the Casino Queen implied was untrue, but the Casino Queen did not put forth any definitive evidence to the contrary (*see* Docs. 36; 39-2; 39-4, p. 7).

make mistake. Aleks was the person who . . . . always the job was priority."

As further evidence of pretext, Sheshi claims that there were a number of inconsistencies and irregularities with his termination and the appeal process. For example, a notice of termination is normally provided, but Sheshi did not receive one (Doc. 36, p. 4). His wife had to repeatedly request one, and he still did not receive it for over a month (*Id.*). Also, the notice initially indicated that the termination was "involuntary," but that was scratched out and changed to "voluntary" (Doc. 39-1, p. 90); a voluntary termination deprived Sheshi of the ability to apply for unemployment (Doc. 36, p. 3). After Sheshi was terminated, he requested a GFT, but his request was denied, even though the Casino Queen's handbook says a dismissal is an issue eligible for GFT (Doc. 39-2, p. 25). His requests to reconsider were granted, and he was allowed to have a meeting with GFT after waiting another two weeks; Sheshi claims the normal timeframe for a GFT is forty-eight hours (Doc. 36, p. 13). After the GFT hearing, Sheshi was told that a decision would be made in twenty-four hours, but he had to wait for three weeks (*Id.*). The GFT decision said the termination would stand because they could not get the dispatcher who took Sheshi's call on Thursday to write a statement (*Id.*). The dispatcher testified at a deposition, however, that he was never asked to give a statement (*Id.*). Due to the delay in receiving the GFT decision, Sheshi lost his option to continue his health insurance under COBRA and lost his life insurance.

Viewing all of this evidence in a light most favorable to Sheshi, and drawing all inferences in his favor, the Court finds that Sheshi has shown that a triable issue exists as to whether he was intentionally discriminated against throughout the course of his career because of his national origin. A reasonable jury could conclude that there was a

pervasive and long-standing culture of misunderstanding, insensitivity, and stereotyping regarding people of other nationalities. A reasonable jury could likewise conclude that Sheshi was treated unfairly with respect to job assignments, time off, and disciplinary measures because he was a foreigner, and that the Casino Queen's reason for terminating Sheshi was insincere, and the termination was actually motivated by Sheshi's national origin.

Consequently, summary judgment for the Casino Queen is denied as to Sheshi's Title VII discrimination claim.

### D. Retaliation

Title VII prohibits employers from retaliating against employees for complaining about prohibited discrimination. 42 U.S.C. § 2000e–3(a). As with a Title VII discrimination claim, a plaintiff may defeat summary judgment on a Title VII retaliation claim by relying on the direct or indirect method of proof. *See Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Under either method, the ultimate question at the summary judgment stage is whether the evidence would permit a reasonably jury to conclude that Sheshi suffered an adverse employment action because he engaged in activity protected under Title VII. *See id; Orton-Bell v. Indiana*, 759 F.3d 768, 776 n.6 (7th Cir. 2014).

Here, Sheshi claims that Director of Security Ed Muzzey asked him to testify about something he had not witnesses [sic] and had no knowledge of," and Sheshi refused (Doc. 36, pp. 17, 18). Following his refusal, Sheshi claims his relationship with Mr. Muzzey completely changed and began to deteriorate. After Sheshi was accused of stealing tips, Muzzey made Sheshi empty his pockets, and Muzzey issued Sheshi a

write-up for "failing to follow procedures." According to Sheshi, he complained to Muzzey that he was being singled out and discriminated against. After that, Sheshi was permanently assigned to turnstiles. One month later, Sheshi was terminated for "no call no show" when he thought he had been granted funeral leave, or at the very least he had called off for those days.

The Casino Queen argues that it is entitled to summary judgment because Sheshi did not engage in any protected activity (Doc. 31, p. 13). The Title VII anti-retaliation provision prohibits an employer from discriminating against any employee "(1) because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or (2) because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009) (quoting 42 U.S.C. § 2000e–3(a)). The first clause is known as the "opposition clause," and the second is known as the "participation clause." *Crawford*, 555 U.S. at 274.

Sheshi argues that he engaged in protected activity when he refused to testify for the Casino Queen (Doc. 36, p. 17). At his deposition, Sheshi testified that Ed Muzzey told him that he needed "to go to some trial" and testify for the Casino Queen. Sheshi said "some kind of patrons was accusing Casino Queen about something," but he couldn't remember what it was about. Sheshi said he refused to testify "because [he] was not there. [He] did not see anything." (Doc. 39, pp. 37, 38).

This incident is not a protected activity under the participation clause because it did not involve an official Title VII investigation. *See Hatmaker v. Memorial Medical*

*Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010) (explaining that the participation clause prohibits retaliation against an employee who participated in any manner in an investigation "by an official body authorized to enforce Title VII."). This incident also is not a protected activity under the opposition clause because there is no indication that Sheshi's refusal to testify was in any way related to, or could be characterized as, opposing some sort of discrimination.

Sheshi also argues that he engaged in protected activity when he "voiced his grievances" about being accused of tip stealing by a co-worker who persistently harassed him and about the way he was treated by Ed Muzzey when he investigated the accusation (Doc. 36, pp. 17, 18). Again, this incident is not a protected activity under the participation clause because it did not involve an official Title VII investigation. It could, however, constitute a protected incident under the opposition clause. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Crawford*, 555 U.S. at 276. But the problem is that the Court is unaware of any evidence that Sheshi ever told Muzzey or anyone else at the Casino that he suspected national origin discrimination during the investigation of the tip-stealing accusation. Sheshi made allegations in the complaint to this effect (Doc. 1, ¶¶ 26, 27). And he claimed as much in his brief (*see, e.g.*, Doc. 36, p. 18).[4] But Sheshi did not cite to any evidence to support those claims, and the Court did not come across

---

[4] In the brief, Plaintiff stated, "Here, [the] jury will be lead [sic] inexorably to a conclusion that casino retaliated against Aleks . . . once he voiced his grievances about being accused of tip stealing based on a report of a persistent harasser of foreigners and after unsubstantiated accusations by his superiors which every immigrant, without fail, would take as a reflection on their foreign origin." (Doc. 36, p. 18)

any during its own review of Sheshi's deposition or the rest of the record.

Because Sheshi failed to establish that he engaged in protected activity, which is an essential element of a Title VII retaliation claim, Defendant is entitled to summary judgment on this claim. *See, e.g., Johnson v. Beach Park Sch. Dist.*, 638 F. App'x 501, 502–03 (7th Cir. 2016); *Orton–Bell v. Indiana,* 759 F.3d 768, 776–77 (7th Cir.2014); *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012).

## IV.  *ADEA Claims*

Like Title VII, the Age Discrimination in Employment Act ("ADEA") prohibits employers from subjecting any individual to a hostile work environment, or discriminating against any individual, because the individual is 40 years of age or older. 29 U.S.C. §§ 623(a), 631(a).[5] Employers are also prohibited from retaliating against employees for complaining about unlawful age discrimination. 29 U.S.C. § 623(d).

Sheshi asserts a discrimination claim, a hostile work environment claim, and a retaliation claim under the ADEA. Before discussing the merits of the claims, the Court will first address the Casino Queen's concern regarding Sheshi's actual age (*see* Doc. 31, p. 19).

### A.  Plaintiff's Age

The Casino Queen claims that Sheshi's "age itself" was "left unresolved by discovery," and therefore it "should not have to exhaust further resources defending this untenable assertion of a civil rights violation" (Doc. 31, p. 19). Admittedly, there is some

---

[5] The Seventh Circuit has "assumed without deciding that plaintiffs may bring a claim of a hostile work environment under the ADEA." *Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 603 n.1 (7th Cir. 2014); *Racicot v. Wal–Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001).

inconsistency in the record about Sheshi's age, specifically whether he was born in 1961 or 1963. Sheshi testified at his deposition that he was born in 1961 (Doc. 39, p. 4). His certificate of naturalization and his passport also indicate that he was born in 1961 (Doc. 31-6, pp. 3, 4). On the other hand, Sheshi's I-94 form (the form used by the INS to document Sheshi's arrival in the United States) says he was born in 1963 (Doc. 31-6, p. 1), and so does his driver license (Doc. 31-6, p. 3). Sheshi's wife explained at her deposition that the inconsistency and confusion about Sheshi's birthdate began with an error in his immigration paperwork. She said Sheshi was "born [in] '61. But for some reason, when we arrive here from Greece, it was '63. '63 for some reason and was hard for us 'til so we change to '61. When the paper come from– to– from Greece to International Institute, for some reason, it was '63. But he born in '61." (Doc. 39-5, p. 22).

It seems to the Court that the Casino Queen is making a mountain out of a molehill. First, it is quite common for immigrants to enter the United States with an incorrect or uncertain date of birth. *See, e.g.,* Ross Pearson, *What's My Age Again? The Immigrant Age Problem in the Criminal Justice System*, 98 MINN. L. REV. 745 (2013). Second, regardless of whether Sheshi was born in 1961 or 1963, he was over the age of 40 and had been under the protection of the ADEA for over a decade by the time he was fired in November 2014. Therefore, the discrepancy regarding Sheshi's age does not render his ADEA claims factually and legally baseless, as the Casino Queen suggests, nor does it entitle the Casino Queen to summary judgment on those claims.

## B. Discrimination

At the motion hearing, the Court indicated that summary judgment on Sheshi's claim for discrimination under the ADEA was denied. After further research and consideration, however, the Court believes it made a mistake; the Casino Queen is entitled to judgment as a matter of law on this claim.[6]

Like its Title VII counterpart, an ADEA claim for discrimination can be proven using either the direct or indirect method of proof previously described in this Order. *See, e.g., Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). In this instance, the Court need not conduct a separate and detailed analysis of the record for each method because Sheshi has not marshaled enough evidence to succeed under either one.

Sheshi cites to three pieces of evidence to support his age discrimination claim (Doc. 36, pp. 16, 17). First, Sheshi claims that "was subjected to discipline as no other security guard, and being over the age of 40 he can clearly support his claim of age discrimination" (Doc. 36, p. 17). The crux of this claim is that employees under the age of 40, who acted in a manner materially similar to Sheshi or faced circumstances materially similar to Sheshi, were treated more favorably because they were not disciplined or discharged. But Sheshi did not identify, and the record does not reveal, who those other employees might be. Thus, the Court is left with only Sheshi's own speculation about

---

[6] The Court has the inherent power to modify and revise interlocutory orders at any time prior to the entry of final judgment. *Marconi Wireless T. Co. of Am. v. United States*, 320 U.S. 1, 47–48 (1943) ("[T]he court did not lack power at any time prior to entry of its final judgment at the close of the accounting to reconsider any portion of its decision and reopen any part of the case."); *Kapco Mfg. Co.*, 773 F.2d at 154 ("A court always ha[s] the power to modify earlier orders in a pending case."); *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985) ("Of course, if the order was interlocutory, [the district judge] had the power to reconsider it at any time before final judgment."); Fed. R. Civ. P 54(b) (providing that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

other employees, but "speculation is not evidence." *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016). *See also Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) (holding employee failed to establish that similarly situated employees outside protected class were treated more favorably when she failed to point to any other employee to serve as basis for comparison, but simply claimed that record was devoid of others receiving similar treatment from supervisor and employer).

Second, Sheshi claims that he was terminated right before he was eligible to claim the status of "Casino self-employee," which would have provided him with more benefits and profit-sharing (Doc. 1; Doc. 31, p. 17). Sheshi wants the Court to extrapolate that because he was on the cusp of self-employed status, the Casino Queen must have acted with age-based discriminatory intent when it terminated him. But there is no evidence to suggest this is true. There is nothing that explains what self-employed status is, how it works, what benefits are attached to it, or whether those benefits are still received after an employee leaves the Casino Queen or is fired. There is also nothing that explains whether the Casino Queen is on the hook for anything to an employee who reaches self-employed status; if the Casino does not have to pay anything out to the employee, then in turn, it does not make any sense that it would terminate Sheshi to prevent him from reaching self-employed status. Without any evidence regarding self-employed status, the Court is once again left with nothing more than Sheshi's speculation.

Third and finally, Sheshi points to Mike Warner's testimony that he did not specifically tell Sheshi to call off each and every day that Sheshi needed to miss work

because Sheshi "had worked there longer than I had. I was sure he knew the call-off procedures" (Doc. 36, pp. 16–17; Doc. 39-4, p. 7). This appears to be a statement of fact, plain and simple. Just because Warner's comment invoked Sheshi's years of experience does not automatically mean that his comment was also age-based. *See, e.g., Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other . . . .") Additionally, nothing about Warner's comment implies that Sheshi's productivity and competence was declining as he got older, which is the essence of an age discrimination claim. *Id.* at 610. Consequently, no reasonable jury could infer from Warner's comment that he was discriminating against Sheshi based on his age.

In sum, Sheshi cites to only one piece of actual evidence to support his age discrimination claim. But that piece of evidence, by itself, is wholly insufficient to create a genuine dispute of material fact. Accordingly, the Casino Queen is entitled to summary judgment on this claim.

### C.  Hostile Work Environment and Retaliation

Sheshi asserts that he was harassed and retaliated against because of his age (Doc. 1; Doc. 36, pp. 16–17). The Casino Queen did not discuss or move for summary judgment on either of these claims (*see* Docs. 30, 31). Based on the Court's own review of the record, however, Sheshi has not come forward with any evidence that demonstrates a genuine issue of material fact for trial.

Specifically, there is no evidence that any Casino Queen employee made any comments relating to, or even referencing, Sheshi's age. Consequently, no rational juror

could infer that Sheshi was subjected to a hostile work environment because of his age. There is also no evidence that Sheshi ever complained about purported age-based harassment, and therefore, no rational juror could infer that Sheshi was retaliated against for making such complaints. Sheshi offered only his own conclusory and generalized statements, which are not sufficient to avoid summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) ("[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." (quoting *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004))); *see also Gabrielle M. v. Park Forest–Chi. Heights, Ill. Sch. Dist. 163,* 315 F.3d 817, 822 (7th Cir.2003) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." (quotation marks omitted)).

Under Rule56(f), a court can grant summary judgment *sua sponte* to a non-movant or on grounds not raised by a party, after giving the party against whom summary judgment may be entered both notice of this possibility and a reasonable time to respond. FED. R. CIV. P. 56(f). Sheshi is hereby notified that the Court intends to grant summary judgment in favor of Defendant on Sheshi's claims for hostile work environment and retaliation under the ADEA. If Sheshi has some basis to preclude entry of summary judgment against him on these claims, he must file a response explaining his opposition, along with any supporting evidence within thirty days of the entry of this Order.

<u>CONCLUSION</u>

The motion for summary judgment filed by Defendant Casino Queen (Doc. 30) is **GRANTED in part and DENIED in part.** Summary judgment is **GRANTED** in favor of Defendant on Sheshi's common law claim for retaliatory discharge (Court Four) and Sheshi's claim for retaliation under Title VII (Count Three). Those claims are **DISMISSED with prejudice**.

Additionally, the Court **NOTIFIES** Plaintiff that it intends to grant summary judgment for Defendant on Plaintiff's claims for hostile work environment and retaliation under the ADEA. Plaintiff must file any response opposing the proposed grant of summary judgment by **October 16, 2016**.

Finally, summary judgment is **DENIED**, and this case shall proceed to trial on Plaintiff's claims for discrimination and hostile work environment under Title VII (Count One).

**IT IS SO ORDERED.**

**DATED:   September 16, 2016**

**NANCY J. ROSENSTENGEL**
**United States District Judge**